RREF BB Acquisitions, LLC v. MAS Props., LLC, 2015 NCBC 58.

STATE OF NORTH CAROLINA

COUNTY OF BRUNSWICK

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 193

RREF BB ACQUISITIONS, LLC,
          Plaintiff

          v.

MAS PROPERTIES, L.L.C. a/k/a MAS
PROPERTIES LLC; MARK A. SAUNDERS
and SIBYL H. SAUNDERS,
          Defendants/Third-Party
          Plaintiffs

          v.

BRANCH BANKING AND TRUST
COMPANY,
          Third-Party Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**OPINION AND ORDER**

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Plaintiff and Third-Party Defendant's Joint Motion for Summary Judgment and Plaintiff and Third-Party Defendant's Motion to Strike Affidavit of Deborah A. Boodro and Portions of the Affidavits of Douglas T. Yeates, John Marshall and Mark A. Saunders. On April 22, 2015, the Court held a hearing on the Motions.

THE COURT, after reviewing the Motions, briefs in support of and in opposition to the Motions, the record evidence filed by the parties, the arguments of counsel, and other appropriate matters of record, FINDS and CONCLUDES as stated herein.

> *Poyner Spruill LLP by Daniel G. Cahill, Esq., James S. Livermon, III, Esq. and Richard A. Prosser, Esq. for Plaintiff RREF BB Acquisitions, LLC and Third Party Defendant Branch Banking and Trust Company.*

*Graebe Hanna & Sullivan, PLLC by Christopher T. Graebe, Esq. and Mark R. Sigmon, Esq. for Defendants and Third Party Plaintiffs MAS Properties, L.L.C. a/k/a MAS Properties LLC, Mark A. Saunders and Sibyl H. Saunders.*

McGuire, Judge.

<u>PROCEDURAL HISTORY</u>

1.    On January 31, 2013, Plaintiff RREF BB Acquisitions, Inc. ("RREF") commenced this action against Defendants by filing its Complaint in Brunswick County Superior Court. The action was designated as civil action number 13 CVS 193 by the Clerk of Superior Court of Brunswick County.

2.    In the Complaint, Plaintiff alleges two claims for relief: for breach of a Promissory Note dated November 6, 1997 (as to Mark Saunders and Sibyl Saunders) ("First Claim"), and for breach of a Promissory Note and Guaranty of Payment dated February 8, 2005 (as to MAS Properties, Mark Saunders and Sibyl Saunders) ("Second Claim").

3.    On April 29, 2013, Defendants MAS Properties, L.L.C. a/k/a MAS Properties LLC ("MAS"), Mark A. Saunders ("Mark Saunders") and Sibyl H. Saunders ("Sibyl Saunders") (collectively, "Defendants") filed an Answer and Counterclaims against Plaintiff, and a Third Party Complaint naming Branch Banking & Trust Company ("BB&T"). Defendants allege the following claims for relief against RREF and/or BB&T: (1)First Claim for Relief [Declaratory Judgment Pursuant to N.C. Gen. Stat. §§ 1-253 to 267]; (2) Second Claim for Relief [Breach of Contract]; (3) Third Claim for Relief [Breach of the Implied Covenant of Good Faith & Fair Dealing]; (4) Fourth Claim for Relief [Breach of Duty to Negotiate in Good Faith]; (5) Fifth Claim for Relief [Misrepresentation/Fraudulent Concealment]; (6) Sixth Claim for Relief [Breach of Fiduciary Duty/Constructive Fraud]; (7) Seventh Claim for Relief [Unfair and Deceptive Trade Practices]); (8) Eighth Claim for Relief [Indemnity/Subrogation]; and (9) Ninth Claim for Relief [Violation of Equal Credit Opportunity Act].

4. On July 1, 2013, Plaintiff filed a Motion to Dismiss and Amended Reply to Counterclaim. Third-Party Defendant BB&T filed a Motion to Dismiss Third Party Complaint on August 2, 2013. Pursuant to a stipulation by all parties on July 26, 2013, Plaintiff and Third-Party Defendant filed a Joint Memorandum in Support of Motions to Dismiss ("Memo") on August 2, 2013.[1]

5. On November 3, 2014, Plaintiff and BB&T filed their Joint Motion for Summary Judgment, supporting evidentiary materials, and a Memorandum in Support. In the Joint Motion for Summary Judgment, Plaintiff seeks summary judgment on its two claims for breach of promissory notes and the guaranties. Plaintiff and BB&T also seek summary judgment on each of the nine counterclaims/third-party claims made by Defendants. Defendants filed a response in opposition to the Joint Motion for Summary Judgment and supporting evidentiary materials including, *inter alia*, the Affidavits of Debra Boodro, Douglas T. Yeates, John Marshall and Mark A. Saunders

6. On March 23, 2015 Plaintiff and BB&T filed their Motion to Strike Affidavit of Debra Boodro and Portions of Affidavits of Douglas T. Yeates, John Marshall and Mark A. Saunders ("Motion to Strike"). Defendants filed a response in opposition to the Motion to Strike.

## FACTS

7. Defendant Mark Saunders ("Saunders") has been in real estate development in North Carolina for roughly thirty years.[2] He is currently the principal of a group of Brunswick County real estate businesses known as "The Coastal Companies."[3] The Coastal

---

[1] The Motions to Dismiss are coextensive with the Motion for Summary Judgment. Accordingly, and with the consent of the parties, the Court considers the Motions to Dismiss as subsumed in the Motion for Summary Judgment.

[2] *See* Deposition of Mark A. Saunders ("Saunders Dep.") 15.

[3] Dep. Ex. 149; Saunders Aff. ¶ 2; *see* Deposition of Elaine Jordan ("Jordan Dep.") 5;.

Companies provide services in both commercial and personal real estate development. Coastal Companies employs in-house counsel, Elaine Jordan ("Jordan").[4]

8.      Saunders is also the registered agent and a member/manager of Defendant MAS Properties ("MAS"), a North Carolina limited liability company that conducts business under the Coastal Companies umbrella.[5]

9.      Plaintiff RREF BB Acquisitions, LLC ("RREF") is an "acquisition entity" that acquires primarily real-estate secured loans.[6] On December 7, 2012, RREF acquired the loans at issue in this case from Third-Party Defendant BB&T.[7]

10.     Third-Party Defendant BB&T is a large, well-known North Carolina banking corporation. In its Code of Ethics, Policies & Procedures, and Philosophy, which are available to the public, BB&T promotes "honesty," "integrity," "open communication," and "transparent, extensive communication," and pledges to avoid "manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair dealing practice."[8] Mark Saunders has been a customer of BB&T and its local predecessor, United Carolina Bank ("UCB"), for approximately thirty years.[9] During that time, Robert Cox ("Cox"), BB&T's agent in the Shallotte, North Carolina office, served as Saunders' primary contact with BB&T and/or UCB.[10] Saunders was among Cox's largest clients.[11]

11.     The matter currently pending before the Court arises from a dispute over two loans between BB&T and Defendants. On November 6, 1997, BB&T and Mark Saunders

---

[4] Jordan Dep. 5.
[5] Compl. ¶ 2; Countercl. ¶ 1; Dep. Ex. 150 ("2008 MAS Properties Annual Report"); Saunders Dep. 38, 44.
[6] 30(b)(6) Deposition of RREF BB Acquisitions, LLC by Mark King ("King Dep.") 5-6.
[7] *See* Dep. Ex. 91 (Purchase Agreement); King Dep. 123-125.
[8] Dep. Ex. 2 ("BB&T Code of Ethics"); Dep. Ex. 3 ("Policies and Procedures") 42; Dep. Ex. 4 ("BB&T Philosophy") 8, 20.
[9] Saunders Aff. ¶ 2. United Carolina Bank was acquired by BB&T in 1997. *Id.*
[10] Deposition of Robert Cox ("Cox Dep.") 20, 37; Saunders Aff. ¶ 2.
[11] *Id.*

executed a promissory note for a $1,000,000.00 loan to Mark Saunders, with his wife, Sibyl Saunders, identified as an "Additional Co-maker."[12]  On February 8, 2005, BB&T made a second loan, in the amount of $4,275,000.00, to MAS.[13] Mark and Sibyl Saunders entered into Guaranty Agreements in connection with the 2005 loan to MAS.[14] (The 1997 and 2005 loans are collectively referred to as "the Loans").

12.     Though the original terms of the Loans were for one and three years, respectively, BB&T and Defendants extended, modified, or renewed the Loans on almost an annual basis until 2012. Many of these renewals took place after the Loans had reached maturity.[15]

13.     In early 2012, Bank of America initiated legal proceedings against Defendants and related entities, seeking recovery on loans worth over $70 million and the appointment of a receiver.[16] In the lawsuit, Bank of America sought the appointment of a receiver to manage certain of Saunders' business property based on a default on loans taken with Bank of America.

14.     BB&T became aware of the Bank of America lawsuit and decided not to renew the Loans.[17] On February 2, 2012, one month prior to the maturation date of the Loans,[18] Steve Gruendel ("Gruendel"), BB&T outside counsel, sent written notice to Defendants that BB&T did not intend to renew the Loans.[19]

---

[12] Dep. Ex. 5 ("1997 Note").

[13] Dep. Ex. 7 ("2005 Note").

[14] Dep. Exs. 8, 9, 140, 179, 180, 181, 182 (original guaranty agreements and subsequent loan modifications).

[15] Saunders Aff. ¶ 10; Dep. Exs. 5, 7, 139, 140, 179, 180, 181, 182.

[16] *See generally* Bank of Am. v. E. Carolinas' Constr. & Dev. LLC, Brunswick Co. No. 12 CVS 33 (N.C. Super. Ct. filed Jan. 6, 2012).

[17] Dep. Ex. 25 (email from Hennessy to Bean); Deposition of Michael Hennessy ("Hennessy Dep.") 116-17.

[18] Though Defendants dispute whether the Loans in fact matured on that date, Saunders identified the March 2, 2012 date as the date that the Loans were "Set to mature." Saunders Dep. 101.

[19] Dep. Exs. 26, 27.

15.     On February 27, 2012, Saunders and Jordan met with BB&T representative Cindy Bean ("Bean") and Gruendel at the Shallotte BB&T Branch to discuss BB&T's decision not to renew the Loans.[20]  At the time of the meeting, Saunders understood that management of the Loans had been transferred from his primary BB&T contact, Cox, to Bean, and knew that Bean worked for a "troubled loan/workout sort of department" at BB&T.[21] At the end of that meeting, the parties held a mutual understanding that BB&T would not take any action on the Loans for 60 days.[22]

16.     On March 2, 2012, the Loans matured under the existing written terms.[23]

17.     On March 6, 2012, BB&T's outside counsel sent Jordan draft copies of forbearance agreements that would release BB&T from liability to the Saunders for any claims arising from the Loans, in exchange for which BB&T was willing to honor the 60-day wait period to see what happened with the Bank of America receivership motion.[24] Saunders testified in his deposition that he was "unfavorably surprised" by the draft forbearance agreements, which to his recollection had not been discussed at the February 27 meeting and which had never been required for previous extensions or modifications of the Loans.[25] Defendants did not accept the forbearance agreements, and the agreements were never executed.[26]

18.     On March 9, 2012, the Honorable John R. Jolly, Jr. denied the Bank of America receivership motion.[27] On March 14, 2012, Gruendel sent Saunders a "reservation of rights"

---

[20] Saunders Dep. 94; Jordan Dep. 68-69; Deposition of Cynthia Bean ("Bean Dep.") 37-41.
[21] Saunders Dep. 96-97. Bean's title at that time was "Problem Loan Administrator." Bean Dep. 10.
[22] Saunders Dep. 98-99; Deposition of Stephen Gruendel ("Gruendel Dep.") 18.
[23] Saunders Dep. 84, 101; Jordan Dep. 75, 80, 97.
[24] Dep. Ex. 144; Saunders Dep. 100-01; Gruendel Dep. 21.
[25] Saunders Dep. 100-01.
[26] Saunders Dep. 130; Jordan Dep. 76, 113-14.
[27] Bank of Am. v. E. Carolinas' Constr. & Dev. LLC, Brunswick Co. No. 12 CVS 33 (N.C. Super. Ct. Mar. 9, 2012) (Order on Motions for Appointment of Receiver).

notice, informing him that, in spite of Judge Jolly's order, BB&T remained concerned about the remaining Bank of America litigation and the mature status of the BB&T Loans. The notice informed Saunders that BB&T's forbearance from taking action on the Loans was still contingent on Defendants' execution of the forbearance agreements, and that, in the absence of an executed agreement, BB&T "intend[ed] to commence the exercise of its rights and remedies with respect to the Loans."[28]

19. In or around March 2012, BB&T also began to market the Loans to potential third-party purchasers.[29] On March 23, 2012, Bean emailed Mike Hennessy ("Hennessy"), the group leader for BB&T's North Carolina asset resolution group, informing him that the Loans were "already being marketed."[30] It is undisputed that BB&T never informed Defendants that it was marketing or attempting to sell the Loans.

20. The parties continued to negotiate the terms of the Loans for several months, through summer and into fall 2012.[31] Nevertheless, in July 2012, BB&T notified Defendants that it was initiating formal foreclosure proceedings as to the properties securing the Loans.[32]

21. On October 2, 2012, BB&T created an "internal asset summary form" related to a possible sale of the Loans.[33] On the same date, Bean emailed Saunders a request for certain financial information to "evaluate a restructure" of the Loans.[34] Saunders' response

---

[28] Dep. Ex. 34.

[29] Though Plaintiff's witnesses identified inconsistent dates on which the Loans were originally marketed, the record suggests that the Loans were marketed as early as January 2012. Saunders Aff. Ex. 1. (Email to Bean and Hennessy dated January 31, 2012, informing Bean and Hennessy of some "interested potential purchasers" for the Loans).

[30] Dep. Ex. 35.

[31] *See, e.g.*, Dep. Ex. 36 (Letter from Saunders to Bean dated April 4, 2012); Dep. Ex. 42 (Emails between Jordan and Gruendel dated April 10-11, 2012); Dep. Ex. 58 (Letter from Saunders to Bean dated July 16, 2012); Dep. Ex. 115 (Email from Bean to Saunders dated August 9, 2012); Dep. Ex. 156 (Letter from Saunders to Bean dated October 12, 2012, including financial information requested by Bean during an October 2, 2012 meeting).

[32] Dep. Exs. 67-68, 106. The foreclosure hearings were later postponed in exchange for Saunders paying the interest owed on the Loans. Gruendel Dep. 62-63; *see* Dep. Exs. 77, 168.

[33] Dep. Ex. 13; Hennessy Dep. 53-56; Bean Dep. 22-24.

[34] Dep. Ex. 80.

stated that he was providing the attached information to "assist BB&T in evaluating [Defendants'] loan proposals dated July 16, 2012," and that he was doing so with the understanding that it would not be used for any other purpose or disclosed to anyone outside of BB&T.[35]

22. On or about October 22, 2012, Plaintiff RREF received a copy of the October 2 asset summary regarding the Loans from BB&T.[36]

23. On October 25, 2012, in anticipation of a meeting scheduled between BB&T and Defendants, Gruendel sent Defendants a term sheet with BB&T's proposed terms for restructure of the Loans.[37] The term sheet, labeled "Term Sheet for Discussion Purposes Only," contained disclaimers on every page that it did "not constitute any kind of commitment or undertaking" and that the terms therein were "subject to the internal approval process" of BB&T.[38]

24. On October 29, 2012, Saunders, Jordan, and Defendants' outside counsel, Rick Rayburn, met with Bean, Hennessy, and BB&T's legal counsel to discuss terms of a restructuring of the Loans.[39] The parties dispute whether a final "meeting of the minds" was reached at the October 29 meeting as to all material terms of a restructure agreement, but the record indicates that the parties agreed on many of the proposed terms contained in the October 25 term sheets.[40] As part of the agreed terms, Saunders was to convey certain real estate to BB&T in satisfaction of part of the Loan debt. Defendants were also to create a new legal entity, dubbed "Newco," to which BB&T would make a new loan to refinance the existing

---

[35] Dep. Ex. 156.
[36] King Dep. 54-55, 62-63, 65.
[37] Dep. Ex. 95.
[38] *Id.*
[39] Deposition of Richard Rayburn ("Rayburn Dep.") 6; Saunders Dep. 158-59.
[40] *See, e.g.*, Jordan Dep. 144; Bean Dep. 114; Gruendel Dep. 71; Saunders Dep. 169.

Loans.[41] At the end of the meeting, Saunders and Hennessy shook hands in a manner that Saunders understood to indicate that the parties had reached a deal.[42]

25.     On November 1, 2012, Bean noted in BB&T's internal loan system that the October 29 meeting was "successful in negotiating a structure for extension and deeds in lieu which I will be submitting for approval in the next week or so."[43] On the same date, Gruendel sent Defendants a term sheet revised to reflect BB&T's understanding of the terms agreed upon at the October 29 meeting. The term sheet contained the same disclaimers as the October 25 term sheet: that it did "not constitute any kind of commitment or undertaking on the part of the Bank, but [was] intended solely to facilitate discussions on the materials contained herein," and that the terms were "subject to the internal approval process."[44]

26.     On November 19, 2012, Jordan emailed Gruendel a revised version of the November 1 term sheet, with "changes tracked to meet our understanding of the discussions we had in Charlotte."[45] Among other things, Defendants' revised November 19 term sheet removed Sibyl Saunders as a guarantor and changed Defendants' obligation to renew a building permit from an outright obligation to a "best efforts" standard.[46]

27.     On or about November 20, 2012, Hennessy instructed those involved to cease communications with Saunders and Jordan, because Saunders' notes were "up for sale."[47] In his deposition, Hennessy stated that it was BB&T's policy to go "dark" and cease communications with clients once their notes were posted for sale.[48]   Accordingly, BB&T

---

[41] Saunders Dep. 158-69; Jordan Dep. 10-12, 21-28, 144; Rayburn Dep. 67-69.
[42] Saunders Dep. 169.
[43] Dep. Ex. 98; Hennessy Dep. 264-65; Bean Dep. 119, 150-51.
[44] Dep. Ex. 97.
[45] Dep. Ex. 100.
[46] *Id.*
[47] Hennessy Dep. 150.
[48] *Id.*

never responded to Defendants' November 19 revised term sheet, and did not engage in any further negotiations with Defendants over a restructure agreement.

28. On December 4, 2012, Jordan sent Gruendel a follow up email regarding the "term sheet and restructure closing."[49] Gruendel responded that BB&T was "having some internal discussions still" and that he would be in touch "as soon as [he had] something to report."[50]

29. On December 7, 2012, BB&T closed a transaction with Plaintiff that included sale of the Loans. On December 13, 2012, Gruendel informed Jordan that BB&T had sold the Loans to Plaintiff.[51] There is no evidence in this record regarding whether Defendants attempted to negotiate a restructuring of the Loans with Plaintiff. Defendants contend that, had they known that the loans were up for sale, they would have attempted to purchase the Loans themselves or had a third party purchase them on their behalf.[52] They also contend that had BB&T notified them that the November 1, 2012 term sheet was a "best and final offer" they would have accepted it.[53]

## DISCUSSION

### Plaintiff/BB&T's Motion to Strike

30. In the Motion to Strike, Plaintiff and BB&T challenge certain testimony contained in the affidavits of four individuals filed by Defendants, moving the Court to strike portions of the testimony contained therein and exclude them from the Court's consideration of the Summary Judgment Motion. Specifically, the Motion to Strike seeks to exclude from evidence: (a) the entire affidavit of Deborah Boodro, (b) paragraphs 5, 6, 7, 9, 11, 12, 13 and

---

[49] Dep. Ex. 100.
[50] *Id.*
[51] Gruendel Dep. 98; Dep. Exs. 87, 171.
[52] Defs.'/Third-Party Pls.' Br. Opp. Mot. Summ. J. ("Defs.' Br.") 20-21
[53] *Id.*

14 of Douglas T. Yeates, (c) paragraphs 6 and 7 of the affidavit of John Marshall, and (d) paragraphs 40 and 41 of the affidavit of Mark Saunders.

31. The Court has considered the Strike Motion, the briefs supporting and opposing the Strike Motion, and the affidavits addressed by the Strike Motion, and concludes, in its discretion, that the Strike Motion should be DENIED.

<u>Plaintiff/BB&T's Motion for Summary Judgment</u>

32. Plaintiff and BB&T have moved for summary judgment both as to Plaintiff's claims, pursuant to Rule 56(a), and as to the counter and third-party claims raised by Defendants, pursuant to Rule 56(b). The claims in this action arise from the maturation of the Loans in March 2012, the negotiations to restructure the Loans, and BB&T's sale of the Loans to Plaintiff in December 2012. Plaintiff and BB&T contend the parties were sophisticated business entities engaged in an arms-length negotiation to restructure two commercial loans, that the negotiations ultimately were unsuccessful, and that BB&T then lawfully exercised its right to sell the loans to Plaintiff. BB&T also contends that it had no duty to disclose to Defendants that BB&T was attempting to sell the Loans while the parties were attempting to negotiate a restructure agreement. Accordingly, Plaintiff and BB&T argue that they are entitled to summary judgment on its claims for breach of the Loans and as to Defendants' third-party claims and counterclaims.

33. Defendants contend that Defendants and BB&T reached an agreement to restructure the Loans at the October 29, 2012 meeting, but that BB&T then refused to honor and subsequently breached the agreement when it sold the Loans to Plaintiff. Defendants also contend that BB&T and Defendants had a long, multifaceted, and unique lender-borrower relationship that created a duty on BB&T to disclose to Defendants that BB&T was attempting to sell the loans. Defendants argue that BB&T's failure to make such disclosure amounted to a fraud on Defendants. Finally, Defendants contend that even if a final and

enforceable agreement on a restructure was not reached, BB&T had a duty to continue negotiating in good faith towards reaching a restructure agreement after the October 29 meeting that required BB&T to inform Defendants that the November 1, 2012 term sheet was BB&T's best and final offer.

34. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (quoting Rule 56(c)). Any inference of fact should be drawn against the movant. *Forbis v. Neal*, 361 N.C. 519, 523-524 (2007) (citing *Caldwell v. Deese*, 288 N.C. 375, 378 (1975)). A genuine issue of material fact will require the court to preserve the issue for a finder of fact. *Bumpers v. Cmty. Bank of N. Va*, 367 N.C. 81, 90 (2013). Although the Court must view the record "in the light most favorable to the party opposing the motion," Rule 56(e) provides that summary judgment may not be defeated by "mere allegations or denials," but rather that the opposition must be supported by "specific facts showing that there is a genuine issue for trial." *Patterson v. Reid*, 10 N.C. App. 22, 28 (1970).

35. The interrelated nature of a number of the claims raised by the parties in this action require the Court address them out of their actual sequence in the pleadings.

*Breach of Fiduciary Duty*

36. In its Sixth Claim for Relief, Defendants allege that "BB&T owed the [Defendants] fiduciary duties as a result of the confidential and fiduciary relationship between BB&T and [Defendants]."[54] Defendants allege that BB&T "had a duty to disclose all material facts to [Defendants]" and "to act in good faith and with due regard for the

---

[54] Countercl. ¶ 86.

[Defendants'] best interests," and that "BB&T's misrepresentations and material omissions were in breach of its fiduciary duties to [Defendants]."[55]

37.    A fiduciary relationship has been defined under North Carolina law to exist when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014) (quoting *Green v. Freeman*, 367 N.C. 136, 141 (2013)). Fiduciary relationships are those "in which there is confidence reposed on one side, and resulting domination and influence on the other." *Dalton v. Camp*, 353 N.C. 647, 651-52 (2001) (emphasis omitted) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)).

38.    There is no reported North Carolina appellate case in which a fiduciary relationship has been found in a borrower-lender transaction. *Dallaire*, 367 N.C. at 368 ("Ordinary borrower-lender transactions . . . are considered arm's length and do not typically give rise to fiduciary duties."); *Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 95 (1965) ("There was no fiduciary relationship; the relation was that of debtor and creditor."); *see also Branch Banking & Trust Co. v. Thompson,* 107 N.C. App. 53, 61 (1992) (The "mere existence of a debtor-creditor relationship between [the parties does] not create a fiduciary relationship." (alteration in original) (citations omitted)); *Lassiter v. Bank of N.C.*, 146 N.C. App. 264, 268 (2001) ("A lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party."). Despite this fact, our Supreme Court has opined that "it is possible, at least theoretically, for a particular bank-customer transaction to give rise to a fiduciary relationship under the proper circumstances."

---

[55] *Id.* ¶¶ 87, 89, 91.

*Dallaire*, 367 N.C. at 368 (citation omitted). Defendants contend that the facts in this case present just such "proper circumstances."

39.     The facts surrounding the relationship between BB&T and Saunders are largely undisputed, although the parties' characterizations of the relationship differ. Saunders and his businesses have banked with the same Shallotte branch of BB&T for approximately 30 years.[56] Saunders worked with one BB&T banker, Robert Cox, for over 25 years.[57] Saunders took out 16 commercial loans with BB&T over the years, and at one point had over $25 million on deposit with the Shallotte branch.[58] Saunders, however, also had significant relationships with other banks, including loans worth roughly $70 million from Bank of America.[59] BB&T also acted as the retail banker for contractors and purchasers of lots in Saunders' communities, making over $250 million dollars' worth of residential mortgage loans.[60] Saunders assisted BB&T charity fundraising campaigns.[61]

40.     Saunders characterizes BB&T as an "advisor and confidant" with whom he met to "assess market conditions" in the local real estate market. BB&T encouraged Saunders to make a 1999 purchase of a community known as "SeaScape," and provided him advice regarding building additional model homes.[62] Saunders also acknowledges, however, that at least as of early 2012, BB&T was treating the relationship like a typical borrower-lender one. In February 2012, BB&T advised Saunders that it did not intend to renew the Loans that the full balances were due on March 2, 2012. In early March 2012, BB&T for the first time sought to have Saunders sign forbearance agreements, and in mid-2012, BB&T initiated

---

[56] Saunders Aff. ¶ 2.
[57] *Id.*
[58] *Id.* ¶ 3.
[59] *Id.* ¶ 11.
[60] *Id.* ¶¶ 4-5.
[61] *Id.* ¶ 6.
[62] *Id.* ¶ 4.

foreclosure proceedings against properties securing the Loans. Certainly, as of mid-2012, at the latest, BB&T made it clear that it viewed the Loans as a business transaction in which it intended to protect its own interests

41. The facts in this case do suggest that Saunders had a trusted, long-term business relationship with BB&T that was mutually beneficial to both. Saunders worked closely with BB&T in financing, developing various residential communities and in selling the homes in those communities. The facts do not, however, create a genuine issue of fact regarding whether BB&T stood in a fiduciary relationship with Saunders. To the contrary, "common to all [fiduciary] relationships is a . . . duty of the fiduciary to act in the best interests of the other party." *Dallaire*, 367 N.C. at 367. It would seem nearly antithetical to require a commercial lender to put a borrower's interests ahead of its own in a business transaction. *Id.* at 368 ("[T]he law does not typically impose upon lenders a duty to put borrowers' interests ahead of their own."). While our appellate courts have held out the possibility that "theoretically" a lender-borrower relationship could create a fiduciary duty, it is difficult to conceive a situation in which a banking lender would owe a fiduciary duty to a sophisticated and experienced business customer.

42. The Eastern District of North Carolina's recent decision in *The Caper Corporation v. Wells Fargo Bank, N.A.*, No. 7:12-CV-357-D, 2013 U.S. Dist. LEXIS 119506 (E.D.N.C. Aug. 22, 2013), is instructive. Although *Caper Corporation* involved a Rule 12(b)(6) motion, the allegations at issue were strikingly similar to the facts present in this case. In *Caper Corporation*, the action arose out of the plaintiff borrower's "dissatisfaction with a loan contract and an associated interest rate swap contract that the parties entered in 2005." *Id.* at *1. The plaintiff alleged claims for fraud, negligent misrepresentation, duress, breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices. *Id.* The plaintiff alleged a 30 year relationship with Wells Fargo, and that Wells Fargo was a "trusted advisor"

with "superiority, control, and influence" over the plaintiff. *Id.* at **22-23. The plaintiff also alleged that it chose to enter into the transaction at issue with Wells Fargo, even though it did not offer the best loan terms, because of the plaintiff's longstanding and close relationship with Wells Fargo. The plaintiff contended that Wells Fargo had "a duty to act in the best interests of its customers, including [the plaintiff]." *Id.* at *23. The Court held that the plaintiff was a "sophisticated business entity that for a number of years acquired, developed, and sold a variety of real properties." *Id.* at *24 (internal quotations and citations omitted). The borrower "simply was unable through negotiation to convince Wells Fargo" to restructure the loan transaction in the manner the plaintiff desired. *Id.* Finally, the Court held that the plaintiff had "failed to plausibly allege any circumstance beyond an arm's-length, creditor-debtor relationship between a bank and a sophisticated, repeat business customer." *Id.* at *25. Accordingly, the district court dismissed all of the plaintiff's claims. *Id.* at *37.

43. In addition, even if a fiduciary relationship had existed between BB&T and Defendants, such relationship ceased once BB&T declared Defendants in default of the Loans and the positions of the parties became adverse. Indeed, as of early 2012, Defendants and BB&T were represented by attorneys and were negotiating to protect their respective best interests. In such circumstances, no fiduciary obligation exists between the parties, and BB&T "did not have an affirmative duty to disclose unfavorable facts" regarding its strategy in the restructuring negotiations. *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 583-84 (2003) (finding that the fiduciary relationship between the parties ended at the point that "both parties were represented by counsel" and "were negotiating for the termination of legal rights").

44. This Court reaches the same conclusion as the court in *Capers*. Although the facts show a significant relationship existed between Saunders and BB&T, they simply are not sufficient to raise a genuine issue of fact regarding the existence of a fiduciary

relationship between the parties. Accordingly, Plaintiff's and BB&T's motion for summary judgment with regard to Defendant's claim for breach of fiduciary duty should be GRANTED.

*Defendants' Claim for Fraudulent Concealment*

45.     In their Fifth Claim for Relief, Defendants allege that BB&T committed fraud against Defendants by failing to disclose to Defendants that BB&T was marketing and attempting to sell the Loans while it was at the same time negotiating with Defendants to restructure the Loans.[63] In order to establish actual fraud, Defendants must show (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with an intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. *Forbis v. Neal*, 361 N.C. 519, 526-27 (2007). "Additionally, reliance on alleged false representations [or concealment] must be reasonable." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 27 (2003). Reliance is unreasonable where the plaintiff could have discovered the truth through reasonable diligence, but did not investigate. *Id.* Defendants contend that BB&T had a duty to disclose, and concealed from Defendants, that it was trying to sell the Loans. Defendants further argue that even if BB&T did not have a duty to disclose, it created a duty to disclose by its representations regarding its corporate honesty, integrity and transparency in dealing with customers.

46.     In order to avoid summary judgment on their claim for fraud, Defendants must demonstrate that there is a genuine issue of fact as to whether BB&T had a duty to disclose, and concealed, that it was trying to sell the Loans. A claim for fraud may be based upon a failure to disclose a material fact only where the party had a duty of disclosure. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009). Such a duty arises (a) when the parties have a fiduciary relationship, (b) where a party to an arms-length transaction "has taken

---

[63] Countercl. ¶ 75.

affirmative steps to conceal material facts from the other," or (c) where a party knows of a "latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Harton v. Harton*, 81 N.C. App. 295, 297-98 (1986); *see also Friedland v. Gales*, 131 N.C. App. 802, 807 (1998). In addition, if a party to a negotiation undertakes to speak, that party is then under a duty to disclose as to the matters about which the party has chosen to speak. *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974) ("The rule is that even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses.").

47. BB&T was not in a fiduciary relationship with Defendants. There also is no evidence in the record that suggests that BB&T took "affirmative steps" to hide that it was marketing and attempting to sell the loans. There was no representation made to Defendants, express or implied, that BB&T would not sell the loans if the circumstances warranted it. Nor is there evidence, such as internal BB&T communications, that BB&T directed their representatives involved in the negotiations with Defendant to conceal the fact that it was attempting to sell the loans. Accordingly, the record evidence fails to create an issue of fact that BB&T took "affirmative steps" to conceal that it was attempting to sell the Loans, and BB&T therefore did not have a duty to disclose on that basis.

48. Typically, commercial parties in arms-length negotiations with one another do not have a duty to disclose. *See B&F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 86 (2001) (finding that the defendant had no duty to disclose to the plaintiffs where the plaintiffs "were sophisticated businessmen, who were experienced with transactions involving commercial leases"); *Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc.*, 124 N.C. App. 383 (1996) (holding that where the two parties were sophisticated in negotiating commercial real estate transactions, the lessor did not have a duty to disclose to the lessee that it was

negotiating a lease with another party for the same premises); *C.F.R. Foods, Inc. v. Randolph Dev. Co.,* 107 N.C. App. 584, 589 (1992) (holding a commercial vendor owed no duty to disclose to a commercial vendee the presence of a landfill containing organic materials where vendee had full opportunity to make pertinent inquiries and failed to do so). As discussed above, even a party who formerly owed a fiduciary duty is no longer required to disclose once the parties are in adversarial positions and are represented by counsel, as BB&T and Defendants were here. *Piedmont Inst. of Pain Mgmt.,* 157 N.C. App. at 583-84.

49.     Defendants contend that "BB&T had a duty to speak under the totality of the circumstances . . . because it knew about a 'defect' in the subject matter of the negotiations *and* because it chose to speak and thus took on the duty to make 'full and fair' disclosure that it was marketing the [Loans]."[64]  Defendants claim that the "totality of circumstances" that created BB&T's duty to disclose included the parties' long-term, close business relationship and history of loan renewals; BB&T's conduct during the restructuring negotiations in 2012; BB&T's public representations regarding its honesty, integrity and transparency; and BB&T's policy of ceasing communications with a customer once it puts a loan up for sale.

50.     The "totality of the circumstances," however, includes *all* of the undisputed facts and not just those on which Defendants have chosen to focus.  Here, the undisputed facts also show that Saunders and MAS were sophisticated business parties with vast experience in the real estate business and in loan transactions. The undisputed facts further establish that in January 2012, BB&T advised Defendants that it would not renew the Loans and demanded payment in full on or before March 2, 2012.  BB&T also sought forbearance agreements from Defendants, initiated foreclosure proceedings and sent Defendants multiple notices that BB&T reserved all rights with regard to the Loans.  The loan restructuring

---

[64] Defs.' Br. at 20 (emphasis in original).

negotiations were handled by individuals with whom Saunders had not previously dealt and who were associated with BB&T's troubled loans group. Both parties were represented by counsel from the time BB&T notified Defendants of the default until the sale of the Loans to Plaintiff. Accordingly, the undisputed facts make it clear that BB&T did not treat the restructuring of the Loans in the same fashion that it had treated prior extensions and modifications of the Loans with Saunders.

51. With regard to BB&T's representations about its honesty, integrity and transparency, these types of general and vague corporate "puffing" could not reasonably have lead a businessman of Saunders' experience to believe that BB&T would not sell the Loans. In addition, it is undisputed that Defendants were not aware of BB&T's policy of ceasing communications with borrowers once BB&T put the customer's loans up for sale. In other words, Defendants could not have relied upon the fact that BB&T was negotiating with them up until November 19, 2012, as an affirmative indication that BB&T *was not* attempting to sell the loans.

52. The *Computer Decisions, Inc.,* 124 N.C. App. 383, and *B&F Slosman*, 148 N.C. App. 81, decisions are instructive on a commercial business entity's duty to disclose during negotiations with another business entity. In *Computer Decisions, Inc.,* the plaintiff corporation was negotiating with Defendant Rouse to lease commercial office space. 124 N.C. App. at 385. Rouse was aware that the plaintiff had a short deadline for securing new office space. *Id.* at 385-86. At an in-person meeting, the parties reached verbal agreement on the key terms of an initial lease, but left certain other terms undecided. Nevertheless, Rouse's vice president stated, "[w]e have a deal." *Id.* The parties later circulated draft terms which Rouse signed, but the parties continued to negotiate over final terms. *Id.* at 386. Unbeknownst to the plaintiff, Rouse was also negotiating with another prospective tenant to lease the same office space while it was negotiating with the plaintiff. Shortly before the

plaintiff needed to move into the new office space, Rouse notified the plaintiff that it had rented the space to another party. *Id.* Computer Decisions brought claims against Rouse for breach of contract, fraud, negligent misrepresentation, and unfair trade practices. The fraud claim was based on Rouse's failure to disclose to the plaintiff that it was negotiating with another tenant. *Id.* at 388-89. The trial court granted summary judgment on all claims, finding that (1) any verbal agreement was unenforceable under the statute of frauds, and (2) Rouse had no duty to disclose its negotiations with the other tenant. *Id.* In affirming summary judgment, the Court of Appeals held that "there is no duty of disclosure in a commercial real estate transaction between commercial parties." *Id.* at 389.

53.    In *B&F Slosman*, the plaintiff Slosman was negotiating the terms of an extension and expansion of a lease for plant space with the defendant corporation, Sonopress, Inc. ("Sonopress"). Despite several exchanges of written proposals and summaries of terms, the parties never reduced the new lease to writing. 148 N.C. App. at 83-84. Slosman, however, alleged that Sonopress had represented that "the parties had an agreement," and that the lease was being signed by Sonopress. *Id.* at 86. Sonopress moved into the expanded space and began paying rent. *Id.* at 84. Sonopress subsequently refused to enter into a written lease, vacated the premises, and stopped paying rent. *Id.* Slosman sued Sonopress for breach of lease, unjust enrichment, and unfair and deceptive business practices, and at trial the court directed a verdict in Sonopress' favor on all claims. *Id.* at 82. On appeal, Slosman argued that Sonopress was estopped from relying on the statute of frauds in defense of the claim for breach of lease because Sonopress fraudulently failed to disclose during the negotiations (1) that the lease was subject to a corporate approval process, (2) that Sonopress had no intention of agreeing to a five year lease term, and (3) that it had rejected written lease terms proposed by Slosman. *Id.* at 86-87. The Court of Appeals affirmed the dismissal of the lease claim on statute of frauds grounds, holding that Sonopress did not have a duty

to disclose because Slosman was a "sophisticated business[ ]" and was "experienced with transactions involving commercial leases." *Id.* at 87.

54. In this case, the undisputed facts are that Defendants were sophisticated business entities highly experienced in commercial real estate loan transactions. It also is undisputed that Defendants were fully on notice of the adversarial nature of the restructure negotiations with BB&T from the very beginning and were represented by counsel throughout the negotiations. Whatever past negotiations between Defendants and BB&T for loan extensions may have looked like, the 2012 restructure negotiations clearly were "arms-length." BB&T never made any express representations to Defendants that it would not sell the loans, nor could Defendants reasonably have assumed BB&T would not sell the loans merely because it negotiated with Defendants over the course of several months. Under these facts, BB&T was not under a duty to disclose Defendants that it was attempting to sell the Loans.[65] Accordingly, Plaintiff's and BB&T's motion for summary judgment on Defendants' claim for fraud should be GRANTED.

*Defendants' Claim for Breach of Contract*

55. The Court will next consider the question of whether Defendants and BB&T reached a binding, enforceable agreement to modify the Loans at the October 29, 2012 meeting. Determination of this question is critical to the analysis of both of Plaintiff's claims for collection on the Loans, and impacts some of Defendants' remaining claims. In their Second Claim for Relief, Defendants allege that the parties reached "a definitive, binding agreement to modify and restructure the two loans" at the October 29, 2012 meeting, that BB&T repudiated and breached the agreement by selling the Loans to Plaintiff, and that

---

[65] At the hearing, Defendants' counsel admitted that had BB&T disclosed that it was attempting to sell the Loans, Defendants could have declared bankruptcy, leaving BB&T with limited opportunity to fully collect on the Loans. Defendants' counsel claimed, however, that Defendants were acting in good faith and would not have declared bankruptcy.

Plaintiff breached that agreement by refusing to abide by the agreement reached between Defendants and BB&T.[66]

56.     Plaintiff and BB&T move for summary judgment on Defendants' breach of contract claim on the grounds that the agreement being negotiated by the parties involved both the conveyance of real property and a commercial loan commitment of more than $50,000, and was therefore subject to the statute of frauds. Plaintiff and BB&T contend that since the agreement was not reduced to writing, it cannot be enforced.[67] Defendants contend that Plaintiff and BB&T should be estopped from raising the statute of frauds because BB&T failed to disclose that it was trying to sell the Loans, and thereby committed fraud.[68]

57.     The North Carolina Court of Appeals has recently restated the long-established proposition that "[i]f a contract falls within the statute of frauds, the party against whom enforcement is sought may generally avoid enforcement if there is no written memorandum of that party's assent to the contract." *Plasma Ctrs. of Am., LLC v. Talecris Plasma Res., Inc.*, 222 N.C. App. 83, 89 (2012). In North Carolina "[a]ll contracts to sell or convey any lands . . . shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized." G.S. § 22-2. In addition, G.S. § 22-5 requires any "commercial loan commitment . . . for a loan in excess of [$50,000]" to be in writing and signed by the party to be bound. Again, it is undisputed that the agreement Defendants seek to enforce involved the restructuring of loans far in excess of $50,000 and the conveyance of certain lands from Defendants to BB&T. It also is undisputed that no written agreement was ever signed by the parties.

---

[66] Countercl. ¶¶ 53-59.
[67] Pl. & Third-Party Def.'s Joint Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 14-16.
[68] Defs.' Br. at 12-15.

58.     Defendants do not dispute that the North Carolina statute of frauds would apply to the agreement allegedly reached on October 29, 2012. Instead, Defendants argue that BB&T should be equitably estopped from raising the defense of the statute of frauds in this case because it had a "duty to disclose" to Defendants that it was trying to sell the Loans and failed to do so.   The North Carolina Supreme Court has recognized that "in proper cases an estoppel predicated upon grounds of silence or fraud may override the statute of frauds." *Powell v. City of Newton*, 364 N.C. 562, 568 (2010) (quoting *Callaham v. Arenson*, 239 N.C. 619, 626 (1954)).   "When faced with oral agreements involving real property interests, our courts have limited the application of the equitable estoppel doctrine to situations where the party seeking to invoke the statute of frauds has engaged in 'plain, clear and deliberate fraud.'"   *Macon Bank v. Gleaner*, __ N.C. App. __, __, 770 S.E.2d 114, 119 (2015) (quoting *B & F Slosman*, 148 N.C. App. 81 (internal citations omitted)).   Thus, application of estoppel is predicated on a finding of *actual fraud.   Id.*

59.     For the same reasons discussed fully above with regard to Defendants' claim for fraud, the Court concludes that BB&T did not have a duty to disclose under the undisputed facts in this record, and Defendants' contention that Plaintiff should be estopped from raising the statute of frauds fails as a matter of law. Since the Court concludes that any agreement reached at the October 29, 2012 meeting would had to have been put in writing pursuant to G.S. §§ 22-2 and 22-5, Plaintiff's and BB&T's motion for summary judgment on Defendants' claim for breach of contract is GRANTED.[69]

*Defendants' Claim for Declaratory Judgment*

---

[69] Plaintiff and BB&T also argue that no binding agreement was reached between the parties on October 29, 2012 because there was no "meeting of the minds" since the parties did not agree on all material terms and because the written terms subsequently exchanged between the parties contained language expressly disclaiming that an agreement had been reached.   Because the Court has concluded that Defendants' claim should be dismissed because of the statute of frauds, it does not reach this argument.

60.     In their First Claim for Relief, Defendants seek a declaratory judgment pursuant to G.S. §1-253 *et seq.* and North Carolina Rule of Civil Procedure 57.  In summary, Defendants seek a declaration regarding (a) whether the parties reached a binding and enforceable agreement to restructure the loans, and (b) whether BB&T has the "legal right" to sell the Loans to Plaintiff.[70]  Plaintiff and BB&T seek summary judgment in their favor as the claim for declaratory relief pursuant to Rule 56(b).

61.     Under North Carolina law, a declaratory judgment is a statutory remedy that grants a court the authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. G.S. § 1-253; *Pine Knoll Shores v. Carolina Water Serv., Inc.*, 128 N.C. App. 321, 321-22 (1998). Summary judgment may be granted on a claim for declaratory judgment if there remain no issues of material fact and either party is entitled to relief as a matter of law. *Smith v. Marez*, 217 N.C. App. 267, 270 (2011) (internal citation omitted).

62.     With regard to Defendants' request for a declaration addressing the existence and enforceability of an agreement to restructure the loans, for the reasons stated above, the Court concludes the parties did not reach a binding and enforceable agreement to restructure the Loans.

63.     The promissory notes and deeds of trust comprising the Loans contain no restrictions whatsoever on BB&T's right to sell the loans.[71]  There are no other facts in the record that suggest BB&T's right to sell the Loans was restricted.  In addition, Defendants do not make any argument that, absent an enforceable restructure agreement, BB&T did not have the "legal right" to sell the Loans to a third party, including RREF.

---

[70] Countercl. ¶¶ 47-52.
[71] Dep. Exs. 5, 7.

64. Accordingly, Plaintiff's and BB&T's motion for summary judgment on Defendants' claim for declaratory judgment regarding the existence of a binding agreement to restructure the Loans and regarding BB&T's right to sell the Loans to Plaintiff is GRANTED in Plaintiff's and BB&T's favor.

*Plaintiff's Claims for Breach of Promissory Notes and Guaranties*

65. The Court will next consider Plaintiff's motion for summary judgment on its two claims for breach of the Loans. In its First Claim for Relief, Plaintiff alleges that Mark and Sibyl Saunders breached their obligations under the promissory note dated November 6, 1997. In the Second Claim for Relief, Plaintiff alleges that MAS breached its obligations under the promissory note dated February 8, 2005, and that Mark and Sibyl Saunders breached their obligations under the guaranty agreements that each of them executed on February 8, 2005. It is undisputed that the Loans were assigned by BB&T to Plaintiff on December 7, 2012, and RREF is now the holder of the Loans.

66. The facts regarding Plaintiff's claims for relief are undisputed. Defendants do not dispute that they executed the promissory notes and guaranties, that the loans provided pursuant to the promissory notes matured, that Defendants defaulted in their obligations once the promissory notes matured, and that Defendants have not repaid the Loans. Defendants' sole defense to these claims is based on their contention that Defendants and BB&T reached a binding and enforceable agreement to restructure the Loans, and accordingly, that they have a new agreement with BB&T. As discussed above, the Court already has concluded that BB&T and Defendants did not enter into a binding and enforceable agreement to restructure the Loans.

67. Accordingly, the Court concludes that Plaintiff is entitled to judgment as a matter of law on its First Claim for Relief as to Mark Saunders, and its Second Claim for

Relief as to Mark Saunders and MAS Properties. The Motion for Summary Judgment as to Plaintiff's First and Second Claims for Relief should be GRANTED as to those parties.

68.     However, in light of Defendant Sibyl Saunders' affirmative defense regarding the Equal Credit Opportunity Act, discussed below, the Court finds that the Motion for Summary Judgment as to Plaintiff's First and Second Claims for Relief should be DENIED as to Sibyl Saunders.

*Defendants' Claim and Affirmative Defense for Violation of the ECOA*

69.     Movants seek summary judgment on Defendants' affirmative defense under the Equal Credit Opportunity Act ("ECOA").[72]  Defendants' Eleventh Affirmative Defense alleges that BB&T violated the ECOA[73] and the related regulations adopted pursuant to the ECOA ("Regulation B")[74] by requiring Sibyl Saunders to co-sign the 1997 Loan and guarantee the 2005 Loan when Mark Saunders and MAS were independently creditworthy. Defendants' Eleventh Affirmative Defense contends that Plaintiff's claims are barred based upon BB&T's violation of the ECOA.

70.     The ECOA prohibits creditors from discriminating against "any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status." 15 U.S.C. § 1691(a). 15 U.S.C. § 1691b provides the Board of Governors of the Federal Reserve System with the authority to "prescribe regulations to carry out the purposes of" the ECOA.  These regulations are collectively known as "Regulation B."

71.     Regulation B provides in pertinent part:

(d) Signature of spouse or other person.

---

[72] Defendants originally alleged that BB&T violated the ECOA as their Ninth Claim for Relief, but voluntarily dismissed that claim in response to Plaintiff's and BB&T's Motion to Dismiss and purported to incorporate the allegations from the Claim into their Eleventh Affirmative Defense.
[73] The ECOA is codified at 15 U.S.C. § 1691 *et seq.*
[74] 12 CFR 202.1 *et seq.*

(1) Rule for qualified applicant. Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested. A creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.

[. . . .]

(5) Additional parties. If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.[75]

The FDIC has issued Guidance on Regulation B stating that "if a creditor routinely requires spousal guarantees . . . . without first ascertaining whether an applicant is creditworthy, then the conditioning of the loan on the spousal guarantee violates § 202.7(d)(1)."[76]

72. The North Carolina Court of Appeals has recently suggested that a violation of the ECOA may serve as an affirmative defense in an action brought by a lender against a guarantor-spouse. *RL Regi N.C., LLC v. Lighthouse Cove, LLC*, __ N.C. App. __, 748 S.E.2d 723 (2013), *rev'd on other grounds*, *RL Regi N.C., LLC v. Lighthouse Cove, LLC*, 367 N.C. 425 (2014). In *RL Regi*, the guarantor spouse had signed a forbearance agreement with the bank that "waiv[ed] and releas[ed] any claims . . . [and] release[d] and discharge[d] the Lender . . . from any and all claims, defenses and causes of action." *RL Regi N.C., LLC*, 367 N.C. at 426. On appeal to the Supreme Court of North Carolina, the Supreme Court found that the defendant had validly waived her ECOA claims as part of a "voluntary settlement,"

---

[75] Regulation B, 12 C.F.R. § 202.7(d) (2015).
[76] Federal Deposit Insurance Corporation, Financial Institution Letters: Guidance on Regulation B Spousal Signature Requirements (2004), *available at* https://www.fdic.gov/news/news/financial/2004/fil0604a.html.

which was not a "precondition to the original contract for credit." *Id.* at 429-430 (citing *Ballard v. Bank of Am.*, 734 F.3d 308, 314 (4th Cir. 2013)).

73.     During her deposition, Sibyl Saunders testified that she signed the promissory notes at issue "simply because [she] was Mark's spouse . . . . It was just something that the bank required in order for him to do what he needed to do businesswise."[77] Cox stated during his deposition that BB&T's regular practice was to require a personal guaranty by the spouse of the borrower unless the borrower requested otherwise.[78] Conversely, Hennessy stated that he did not believe that spousal guaranties were required as a matter of course on commercial real estate loans during the time period at issue, but that he could not say for certain without seeing the loan documents.[79] A question of fact therefore exists as to whether Sibyl Saunders voluntarily signed the Loan promissory notes or was required to do so as Mark Saunders' spouse, in violation of the ECOA.

74.     Furthermore, the Court is persuaded that an issue of fact exists as to whether Sibyl Saunders has waived any ECOA defense. The modification agreements signed in connection with the Loans "affirm[ed] any and all obligations to [BB&T] and certif[ied] that there [were] no defenses or offsets against said obligations."[80] This language is much narrower in scope than the language addressed by the Supreme Court in *RL Regi N.C., LLC.*, and is susceptible of multiple interpretations. Where a contract is ambiguous, the parties' intent is a question of fact that must be resolved by a finder of fact. *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 157 (1983) (citing *Silver v. Bd. of Transp.*, 47 N.C. App. 261, 268 (1980)).

---

[77] Deposition of Sibyl Saunders 43.
[78] Cox Dep. 49-50.
[79] Hennessy Dep. 52.
[80] *See, e.g.*, Dep. Exs. 139-140, 179-182.

75. The Court finds that issues of fact exist as to whether BB&T required Sibyl Saunders to sign the Loans in violation of the ECOA, and whether Sibyl Saunders has waived any ECOA defense by signing the modification agreements at issue. Summary judgment is therefore DENIED as to this defense and as to Plaintiff's ability to recover against Sibyl Saunders on their First and Second Claims for Relief.

*Defendants' Claim for Breach of Implied Covenant of Good Faith*

76. Defendants allege as a Third Claim for Relief that "[u]nder the various loan agreements between BB&T and [Defendants], BB&T impliedly covenanted to them that it would deal with them fairly and in good faith."[81] Defendants allege that BB&T breached this covenant of good faith by its entire course of conduct including, *inter alia*: declaring the Loans in default; failing to renew the Loans once the motion for receivership was denied in the Bank of America lawsuit; failing to disclose to Defendants that it was attempting to sell the Loans; requesting confidential financial information from Saunders that BB&T then disclosed to Plaintiff; failing to abide by the alleged agreement to restructure the loan; and selling the loans to Plaintiff for an inadequate sum without first offering them to Defendants.[82] Since the Court has determined that the undisputed facts establish that the parties did not enter into a binding and enforceable agreement to restructure the Loans, Defendants' claim must be based on an implied covenant arising from the Loans themselves or from some other agreement. *Macon Bank*, 2015 N.C. App. LEXIS 221 *9, n. 2.

77. In North Carolina, "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *SunTrust Bank v. Bryant/Sutphin Prop., LLC*, ___

---

[81] Countercl. ¶ 62.
[82] *Id.* ¶ 63.

N.C. App. __, 732 S.E.2d 594, 603 (2012) (quoting *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228 (1985)).  A breach of the implied covenant of good faith and fair dealing "requires the wrongful intent of a party to deprive another party of its contractual rights." *Hamm v. Blue Cross & Blue Shield of N.C.*, 2010 NCBC 14, ¶80 (citing *Dull v. Mut. of Omaha Ins. Co.*, 85 N.C. App. 310, 318 (1987)).

78.     Preliminarily, given the Court's rulings in this Order regarding Defendants' fraud and breach of contract claims, Plaintiff and BB&T's motion for summary judgment on Defendants' claim for breach of the covenant of good faith, to the extent Defendants' claim is premised on BB&T's failure to disclose and breach of the alleged agreement to restructure the Loans, is GRANTED.

79.     The other conduct on which Defendants rely in support of their claim simply does not create an issue of fact regarding whether BB&T breached of a duty of good faith and fair dealing arising from the Loans.  Defendants allege that BB&T somehow duped Saunders into providing financial and other information to a real estate consultant, Mathias Linden, to be used in its foreclosure efforts and not for a restructuring agreement.[83]  The evidence in the record does not support this allegation.  In fact, the evidence cited by Defendants in support of this allegation does not show that BB&T misled Saunders, nor does it establish for what purpose Linden was retained.[84] To the contrary, Bean's email to Saunders introducing Linden stated only that he was "a real estate consultant [ ] retained by BB&T to assist BB&T in certain situations" and that he would "aid BB&T in evaluating the proposal you have submitted to BB&T regarding your loans with BB&T."[85]  More significantly,

---

[83] Defs.' Br. at 7.
[84] Ex. 115; Hennessy Dep. 216-17; Gruendel Dep. 50-51.
[85] Ex. 115.

Defendants have not pointed to any facts in the record showing that the information provided to Linden was used for any purpose *other* than evaluating the restructuring proposals.

80.     Similarly, the evidence does not create any genuine issue of fact that BB&T acted unfairly or in bad faith by not offering Saunders the opportunity to buy the Loans before it sold them to Plaintiff.  BB&T was not under a contractual or any other obligation to offer to sell the loans to Saunders.  In addition, Hennessy testified without contradiction that BB&T would not sell a defaulted loan back to the customer at a discount because this would be "a direct benefit to the guarantor who didn't honor the obligations to begin with."[86]

81.     Ultimately, the undisputed facts establish that BB&T did not breach a duty of good faith and fair dealing arising from the Loans.  Rather, the restructure negotiations were an arms-length, adversarial process.  Both BB&T and Defendants took actions that they believed necessary to protect their own financial interests while continuing to attempt to reach a resolution on the restructure.  For example, Defendants refused to execute the forbearance agreements requested by BB&T.  The undisputed facts also show that although Defendants were in default on a multi-million dollar loan, BB&T did not immediately and aggressively pursue its rights to foreclose.  Instead, BB&T negotiated with Defendants for over eight months and agreed upon most of the significant elements of a potential restructure, but finally decided to protect its interests by selling the Loans to a third party. Defendants have failed to create an issue of fact regarding their claim for breach of a duty of good faith and fair dealing, and Plaintiff's and BB&T's motion for summary judgment on this claim should be GRANTED.[87]

---

[86] Hennessy Dep. 293-95.

[87] BB&T also argues that since there was no breach of the underlying contract (the Loans), Defendants cannot establish a breach of a duty of good faith arising from the Loans.  In support of their argument, BB&T cites to *SunTrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821 (2012), in which the Court of Appeals affirmed dismissal of a claim for breach of an implied covenant of good faith and fair dealing, holding "[a]s the jury determined that plaintiff did not breach any of its contracts with

*Defendants' Claim for Breach of Duty to Negotiate in Good Faith*

82. As a Fourth Claim for Relief, Defendants have alleged that BB&T breached a duty to negotiate in good faith.[88] Defendants allege that "if the Court finds that BB&T and [Defendants] did not reach a binding agreement, they had nevertheless agreed on all terms necessary to reach a binding agreement, and the parties therefore had a duty to negotiate and finalize the agreement in good faith."[89] Defendants allege that BB&T breached this duty by "repudiating the agreement" and selling the Loans to Plaintiff.[90] Defendants argue that even if no binding and enforceable agreement was reached on October 29, 2012, a finder of fact could still conclude that the parties reached a binding agreement to continue to negotiate in good faith, which BB&T breached by failing to inform Defendants that the November 1 term sheet was its final offer and failing to communicate with BB&T after November 19, 2012.[91]

83. BB&T contends that North Carolina has never recognized a claim for a duty to negotiate in good faith, and urges the Court not to do so in this case. Defendants concede North Carolina has not expressly recognized such a claim, but argue that it should under these facts. Defendants rely primarily on two cases recognizing a duty to negotiate that were

---

defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts." *Id.* at 833. Defendants cite to the United States District Court's decision in *Robinson v. Deutsche Bank Nat'l Trust Co.*, No. 5:12-CV-590-F, 2013 U.S. Dist. LEXIS 50797 (E.D.N.C. Apr. 9, 2013), in which the court analyzed North Carolina appellate law but did not expressly discuss the *Robinson* decision, and rejected the precise argument urged by BB&T here, namely, that there must be some "other" breach of the express contract for a breach of the duty of good faith and fair dealing claim to survive. Since the Court has determined that Defendants' claim fails for other reasons, it does not address Plaintiff's argument.

[88] Countercl. ¶¶ 66-70.

[89] *Id.* ¶ 67.

[90] *Id.* ¶ 68.

[91] Defs.' Br. At 17-18.

decided under the laws, respectively, of West Virginia and New York, *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 408-09 (4th Cir. 2002) and *Sony Ericsson Mobile Comm. USA, Inc. v. Agere Systems, Inc.,* 2007 NCBC 28 (N.C. Super. Ct. 2007), *aff'd,* 195 N.C. App. 577 (2009). In *Burbach*, the Fourth Circuit Court of Appeals stated that it was "following the modern trend in contract law" and held that West Virginia would recognize a claim based on a "binding preliminary agreement" between parties to continue negotiations in good faith without being bound to ultimately agree on a contract. 278 F.3d. at 407-09. The Court based its conclusion in part on the grounds that West Virginia already recognized a claim for good faith and fair dealing arising from a contract. *Id.* at 409. The Fourth Circuit adopted the analysis applied by the court in *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987), and described the "binding preliminary agreement" as follows:

> [The] agreements do not commit the parties to their ultimate contractual objective. Rather, they commit the parties to negotiate the open issues in good faith in an attempt to reach the contractual objective within the agreed framework. Under this duty to negotiate in good faith, a party is barred from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

278 F.3d at 407. The Court further noted that:

> This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, because good faith differences in the negotiation of the open issues may prevent the parties from reaching a final contract. It is also possible that the parties will lose interest due to changed circumstances and will mutually abandon the negotiation.

*Id.* at n.2.

84.     In *Sony Ericsson Mobile,* the Honorable John R. Jolly, Jr. of this Court, applying New York law, also recognized a claim based on a "binding preliminary agreement," describing it as follows:

> A preliminary agreement to negotiate is similar to a preliminary agreement with open terms in that the parties agree to certain primary terms of the

agreement and leave other terms to be negotiated. It is, however, different from a preliminary agreement with open terms in that the parties do not agree to be bound by any substantive terms, but rather agree to continue to negotiate all terms in good faith. Accordingly, a party to such an agreement is not bound by the substantive terms of the agreement, although it may be obligated to negotiate. Such agreement may be enforceable.

2007 NCBC at ¶ 18 n.5 (citing 1 *Farnsworth on Contracts*, § 3.8a, n.4 (3d ed. 2004); *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 624 N.E.2d 1007 (N.Y. 1993)).

85.     Other courts also have held in accord with *Burchbach* and *Sony Ericsson* and adopted the reasoning in *Teacher's Ins. & Annuity Ass'n v. Tribune Co.* to enforce preliminary agreements to negotiate in good faith. *See, e.g., Stanford Hotels Corp. v. Potomac Creek Assoc.*, L.P., 18 A.3d 725, 735 (D.C. 2011)(citing *Teacher's Ins. & Annuity Ass'n*, 670 F. Supp. 491, and recognizing enforceability of a binding preliminary agreement to negotiate in good faith); *Gurley v. King*, 183 S.W.3d 30 (Tenn. Ct. App. 2005) (same); *Cochran v. Norkunas*, 398 Md. 1, 919 A.2d 700 (Md. 2007)(same).  Other courts have recognized a claim based on an agreement to negotiate in good faith without specific reliance on *Teacher's Ins. & Annuity Ass'n.  See e.g., Venture Assoc. Corp. v. Zenith Data Syst. Corp.,* 987 F.2d 429, 433 (7th Cir. 1993)*; Itek Corp. v. Chicago Aerial Ind., Inc.,* 248 A.2d 625 (Del. 1968); 1 E. Allan Farnsworth, *Farnsworth on Contract*, § 3.26b (3d ed. 2004) (numerous cases cited therein).

86.     In its recent decision in *Butler v. Balolia,* 736 F.3d 609 (1st Cir. 2013), the First Circuit Court of Appeals concluded that Washington would recognize a claim based on a binding agreement to negotiate. *Id.* at 614-16. In reaching this conclusion, the court conducted an exhaustive analysis of case law, treatises and other scholarly writings and found that:

> [T]wo things seem clear.  First, many more jurisdictions have recognized the enforceability of contracts to negotiate than have repudiated the doctrine. . . . Second, the trend line appears to be moving steadily in favor of recognizing a cause of action for breach of a contract to negotiate.

736 F.3d at 614 (citations omitted). The court also considered the policy and practical arguments in favor of, and against, the recognition of such a claim, and held that those considerations weighed in favor of finding that Washington would join the "trend line." *Id.*

87.    Defendants argue that the course of the negotiations, the substantial number of terms upon which the parties reached agreement on October 29, 2012, and BB&T's words and conduct following the October 29 meeting created an agreement between the parties to continue to negotiate in good faith towards a final agreement.  Accordingly, Defendants contend that BB&T "was required at a minimum to inform [Defendants]" that the November 1 term sheet was a final offer, and that the failure to do so coupled with BB&T ceasing communications with Defendants constituted a breach of the duty.[92]  The facts in this case show that the parties reached agreement on almost every material term of a restructure agreement on October 29, 2012.  Defendants have presented evidence that "BB&T stressed that the deal needed to, and would, close before the end of the year," and that at the conclusion of the meeting "Saunders and Hennessy shook hands to acknowledge the agreement reached."[93] On November 1, 2012, Bean made an entry in BB&T's internal system that the parties "were successful in negotiating a structure for extension and deeds in lieu which I will be submitting for approval in the next week or so."  In addition, on November 1, 2012, Gruendel emailed Jordan a revised term sheet summarizing the terms on which BB&T' believed the parties had reached agreement.  The term sheet stated that it was "to *facilitate discussion* on the terms contained herein."[94] BB&T, however, never notified Defendants that BB&T considered the November 1 term sheet the last, best and final terms that BB&T would accept, leading Defendants to conclude that they could request further revisions, as they did

---

[92] *Id.* at 18.
[93] Defs.' Br. at 8-9.
[94] Dep. Ex. 97 (emphasis added).

on November 19. Defendants have presented evidence that had Defendants accepted the November 1, 2012 term sheet, the restructure deal would have closed.[95]

88. The Court concludes that, based on the unique facts present in this case, Defendants' claim for breach of a duty to negotiate in good faith may be viable. First, as discussed above, other jurisdictions have recognized such a claim and the trend is in favor of recognizing such claims. Second, North Carolina already implies in every contract a duty of good faith and fair dealing. The Court sees no reason that an agreement to continue negotiating in good faith would not be enforceable, provided that it met all of the requirements for contract formation under North Carolina law. A jury could conclude that while the parties did not reach a final agreement on all of the material terms of a restructure deal in the October 29, 2012 meeting, their words and conduct established an agreement to continue negotiating in attempt to finalize the terms of the agreement and close on a restructure agreement before the end of 2012.[96] While it did not bind either party to the final terms of a restructure deal, such an agreement would carry with it an implied obligation that the parties to conduct any further negotiations of the terms in good faith. A jury also could find that BB&T's failure to notify Defendants that the November 1, 2012 term sheet was its best and final offer after months of negotiations, and BB&T's decision to cease communications with Defendants after Defendants responded to the term sheet, were not "fair dealing" or in "good faith." Accordingly, the Court concludes that there are disputed issues of fact regarding whether the parties entered in an agreement to continue negotiating in good faith, and whether BB&T breached such an agreement, and that Plaintiff's and

---

[95] Hennessy Dep. 274; Saunders Aff. ¶ 34.

[96] North Carolina recognizes that oral agreements may constitute enforceable contracts. *See, e.g.*, *Kornegay v. Aspen Asset Gp., LLC*, 204 N.C. App. 213, 221 (2010). Of course, Defendants still would be required to show that all elements of an enforceable contract under North Carolina law, including the consideration exchanged for the agreement.

BB&T's motion for summary judgment as to Defendants' Fourth Claim for Relief should be DENIED.

*Defendants' Claim for Unfair and Deceptive Trade Practices*

89.     In their Seventh Claim for Relief, Defendants allege that BB&T and Plaintiff committed unfair and deceptive trade practices in violation of G.S. § 75-1.1 *et seq.* Defendants allege that "BB&T's and [Plaintiff's] breaches of contract are accompanied by substantial aggravating circumstances, including" BB&T providing Defendants' "confidential financial information" to Plaintiff.[97]  In their brief, Defendants contend that their unfair and deceptive practices claim is not "exclusively based on a breach of contract with substantial aggravating circumstances."[98]   Rather, Defendants allege that the claim is based on "fraudulent concealment, lying, reliance, and damage from the other claims" raised by their Complaint.[99]  Plaintiff and BB&T contend that the claim for unfair

90.     G.S. § 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To state a claim under G.S. § 75-1.1, a plaintiff must allege (1) that the defendant committed an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or his business. *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298 (2012), *disc. rev. denied*, 366 N.C. 570 (2013). "A practice is unfair when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gupton v. Son-Lan Dev. Co., Inc.*, 205 N.C. App. 133, 143 (2010) (quoting *Walker v. Branch Banking & Trust Co.*, 133 N.C. App. 580, 583 (1999)). "Stated another way, a party is guilty of an unfair act or

---

[97] Countercl. ¶¶ 95-97.
[98] Defs.' Br. 17-18.
[99] *Id.*

practice when it engages in conduct which amounts to an inequitable assertion of its power or position." *Id.* (citation omitted). "A practice is deceptive if it has the capacity or tendency to deceive." *Id.* (citation and alteration omitted).

91.    The Court has concluded that that issues of material fact exist regarding Defendants' claim for breach of duty to negotiate in good faith.  The same conduct upon which Defendant might be able to establish that BB&T acted unfairly or in bad faith arguably also could be sufficient to constitute conduct that is unfair or deceptive within the meaning of G.S. § 75-1.1.  Accordingly, the Court concludes that there are material issues of disputed fact which must be resolved in order to make a determination on Defendants' claim for unfair and deceptive trade practices, and that Plaintiff's and BB&T's motion for summary judgment as to Defendants' Seventh Claim for Relief should be DENIED.[100]

*Defendants' Claim for Indemnity*

92.    Finally, in their Eighth Claim for Relief, entitled "Indemnity/Subrogation," Defendants contend that, to the extent that Defendants are found to be liable to RREF, this liability is derivative of BB&T's actions and that BB&T should be liable in the amount of any judgment entered against Defendants in favor of RREF.

93.    Under North Carolina law, a right of indemnification may arise in three circumstances: (1) an express contract; (2) a contract implied-in-fact; and (3) a contract implied-in-law. *Carl v. State*, 192 N.C. App. 544, 557-58 (2008).[101] In Defendants' brief in

---

[100] The Court also notes that the parties dispute whether or not Defendants suffered injury as a result of BB&T's conduct in this case.

[101] Because Defendants have since identified their claim as one for indemnification, the Court's analysis will focus on that legal theory instead of subrogation. Subrogation is an equitable concept that allows for "the substitution of one person in the place of another with reference to a lawful claim or right." *Gen. Ins. Co. v. Faulkner*, 259 N.C. 317, 324 (1963) (internal quotations omitted). "Subrogation rights are categorized as either the right of conventional subrogation—that is, subrogation by agreement between the insurer and the insured—or the right of equitable subrogation, by operation of law, upon the payment of the loss." *In re A Declaratory Ruling by the N.C. Comm'r of Ins. Regarding 11 N.C.A.C. 12.0319*, 134 N.C. App. 22, 31 (1999) (internal quotations omitted). Even

response to the Motion to Dismiss, Defendants explicitly stated that "Defendants' indemnity claim is an indemnity implied-in-law claim."[102] Defendants go on to say that the Court should not "get tangled in the label for the claim for relief," because Defendants are "simply claiming that" BB&T must bear any of Defendants' liability to RREF.[103] The parties do not dispute that Counterclaim Eight "rises or falls" with Defendants' other Counterclaims.[104]

94.    "[T]he indemnity implied-in-law arises from an underlying tort, where a passive tort-feasor pays the judgment owed by an active tort-feasor to the injured third party." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 39 (2003). The "implied contract" arises from the passive tort-feasor's discharge of an obligation owed by the active tort-feasor, which entitles the passive tort-feasor to recover from the active tort-feasor. *Id.*

95.    Therefore, for this doctrine to apply to the case at bar, Defendants would be a "passive tort-feasor" and, more significantly, BB&T would have to be the "active tort-feasor" *against RREF*. There are no claims in this case suggesting that BB&T has committed a tort, either directly or through Defendants, against RREF.  Though Defendants urge the Court not to be constrained by the doctrine of indemnification, Defendants have presented the Court with no other legal basis from which to conclude that BB&T should be liable for any debt owed by Defendants to RREF.  Plaintiff's and BB&T's motion for summary judgment as to Defendants' claim for indemnification/subrogation should be GRANTED.

<u>CONCLUSION</u>

NOW THEREFORE, based upon the foregoing, it hereby is ORDERED that:

---

if the legal doctrine of subrogation were to extend to a situation like that before the Court, it is undisputed that there exists no "subrogation by agreement" and that Defendants have not yet paid any amount due under the loans such that equitable subrogation would be appropriate. Subrogation is therefore not appropriately before the Court at this time.

[102] Defs.' Br. Opp. Pl.'s & Third-Party Def.'s Joint Mot. Dismiss 22.

[103] *Id.*

[104] Pl.'s Mem. 24; Defs.' Br. at 23.

96.     Plaintiff and Third-Party Defendants' Motion to Strike Affidavit of Deborah A. Boodro and Portions of the Affidavits of Douglas T. Yeates, John Marshall and Mark A. Saunders is DENIED.

97.     As to Plaintiff's First and Second Claims for Relief, the Motion for Summary Judgment is GRANTED regarding Mark Saunders and MAS Properties. The Motion for Summary Judgment is DENIED as to Plaintiff's First and Second Claims for Relief regarding Sibyl Saunders.

98.     To the extent that the Motion for Summary Judgment seeks summary judgment on Defendants' Eleventh Affirmative Defense, the Motion is DENIED.

99.     As to Defendants' First, Second, Third, Fifth, Sixth, and Eighth Claims for Relief, the Motion for Summary Judgment is GRANTED.

100.    As to Defendants' Fourth and Seventh Claims for Relief, the Motion for Summary Judgment is DENIED.

101.    In light of Defendants' representation to the Court that they are no longer pursuing their Ninth Claim for Relief, Defendants' Ninth Claim for Relief is deemed DISMISSED, without prejudice.

This the 9th day of June, 2015.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases